UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
METROPOLITAN    LIFE    INSURANCE
COMPANY,

               Plaintiff,

        -against-

ERIC GISCOMBE, *et al.*,

               Defendants.
---------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
19 CV 4463 (MKB) (CLP)

**POLLAK**, Chief United States Magistrate Judge:

On August 2, 2019, plaintiff Metropolitan Life Insurance Company ("MetLife")

commenced this Interpleader action against Eric Giscombe, Rose Sang Brown, Hughfitz

Giscombe, Laurel Sang, Leonard Sang, Hisland a/k/a Islan Sang, and Shelley Tillman, pursuant

to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 28 U.S.C. §

1001, et seq., 28 U.S.C. § 1335, and Rule 22 of the Federal Rules of Civil Procedure, to

determine the distribution of certain life insurance benefits (the "Plan Benefits") held in the name

of Viva M. Giscombe.  (See Compl.[1]).  Following service of the Complaint upon the defendants,

MetLife deposited the Plan Benefits into an escrow account for disbursement in accordance with

the judgment of the Court.  (See ECF Nos. 5, 13).

On January 27, 2021, MetLife filed a letter request for an Order setting a hearing "for any

interested party to object to the benefits in dispute."  (See Pl.'s Mot.[2]).  On March 23, 2021, the

Honorable Margo K. Brodie issued an Order directing the undersigned to conduct a hearing into

---

[1] Citations to "Compl." refer to MetLife's Interpleader Complaint, filed on Aug. 2, 2019, ECF No. 1.
[2] Citations to "Pl.'s Mot." refer to MetLife's Motion for an Order to Show Cause, filed on Jan. 27, 2021, ECF No. 45.

the challenge raised to the designated beneficiary.  (See Electronic Order, dated Mar. 5, 2021).

Pursuant to the Order, this Court scheduled a video hearing for September 19, 2021.  (See ECF

No. 47; Minute Entry, dated Sept. 20, 2021).  Although the Court invited all defendants to

appear, most of the claimants notified the Court that they would not appear.  (See ECF No. 47).

Only two of the potential claimants, Eric Giscombe and Shelley Tillman, presented testimony at

the hearing.  For the reasons set forth below, it is respectfully recommended that the District

Judge set a trial date or refer the case to mediation.

## FACTUAL BACKGROUND

Viva M. Giscombe ("Decedent") was a retired employee of MetLife prior to her death on

July 11, 2016.  (Compl. ¶¶ 12, 20; Pl.'s 11/30/20 Ltr.[3] at 1).  Decedent maintained basic life

insurance under the MetLife Company-Paid Group Term Life Employee Insurance Plan (the

"Plan").  (Compl. ¶ 12; Pl.'s 11/30/20 Ltr. at 1).  MetLife, as claim fiduciary of the Plan, is

required to administer claims in accordance with ERISA and the documents governing the Plan.

(Compl. ¶ 13).  Under the Plan, a participant may designate a beneficiary, defined as "the person

or persons you chose to receive any benefit payable because of your death."  (Id. ¶ 15).  The Plan

requires that the designation of beneficiary be made in writing and filed with the Plan.  (Id.)  A

participant may change the designation of beneficiary, without the consent of the beneficiary, at

any time by filing a new form with the employer.  (Id.)  If a beneficiary dies prior to the death of

the participant, the beneficiary's rights terminate.  (Id. ¶ 16).

The Plan further provides:

> If there is no Beneficiary at your death for any amount payable
> because of your death, that amount will be divided and paid in
> equal shares to each member of the first class in order listed below

---

[3] Citations to "Pl.'s 11/30/20 Ltr." refer to the November 30, 2020 status letter submitted by plaintiff relating to various service issues, ECF No. 39.

in which there is a person who is related to you and who survives you:

1.  Spouse, Civil Union Partner or Domestic Partner
2.  child;
3.  parent;
4.  brother or sister.

(Id. ¶ 17).

According to the Complaint, the latest beneficiary designation on file for the Decedent was dated April 30, 2012 and named Shelley Tillman as Decedent's primary beneficiary.  (Id. ¶ 18).  Ms. Tillman, who resided in Port Lucia, Florida at the time of the Complaint, is alleged to have been a caregiver for the Decedent.  (Id. ¶ 8).  The only other beneficiary designation was dated much earlier, August 18, 1969, and named Laura Amanda Chen, Decedent's sister, as beneficiary.  (Id. ¶ 19).  However, according to the Complaint, Ms. Chen died on September 16, 2012 and predeceased the Decedent.  (Id.)

At the time of her death, the Decedent was enrolled in the basic life insurance plan which provided $28,000 in Plan Benefits.  (Id. ¶ 21).  On July 14, 2016, Eric Giscombe, Decedent's brother, proceeding *pro se*, submitted a letter to MetLife enclosing an Incident/Investigation Report and medical records, challenging the designation of Shelley Tillman as beneficiary.  (Id. ¶ 23).  In the letter, Mr. Giscombe asserted that "Shelley Tillman put her name on the life insurance by fraudulent means, by way of a fake power of attorney which was not done by an attorney."  (Id.)  He also claimed that the Decedent was "diagnosed with [A]lzheimer's before Shelley Tillman changed the beneficiary."  (Id.)  At the time the Complaint was filed, Mr. Giscombe resided in Mt. Pocono, Pennsylvania.  (Id. ¶ 2).

Ms. Tillman, also proceeding *pro se*, submitted a Claimant's Statement, dated August 23, 2016, seeking the Plan Benefits as the named beneficiary on the documents filed with the Plan. (Id. ¶ 22).  She also submitted a Claimant's Affidavit, stating that the Decedent had no spouse,

no children, and was not survived by her parents.  (Id. ¶¶ 22, 24).  The Affidavit further stated that it was "unknown" how many siblings the Decedent had, although it identified Harold Sang and Laura Cameron as siblings, both of whom pre-deceased the Decedent.  (Id. ¶ 24).

MetLife then sought a Claimant's Affidavit from Eric Giscombe, who confirmed that the Decedent had no spouse or children and that her parents pre-deceased her.  (Id. ¶ 25).  Mr. Giscombe identified Rose Brown and Hughfitz Giscombe as Decedent's living siblings, in addition to himself.  (Id. ¶ 25).  Hughfitz Giscombe, Decedent's brother, residing in Savanah, Georgia, was contacted by MetLife and confirmed Eric Giscombe's statement regarding no spouse, children, or living parents, but he identified an additional brother, Leonard Sang, whose address was unknown.  (Id. ¶¶ 2, 26).  The Decedent's obituary identified two other surviving siblings – Laurel Sang and Hisland a/k/a Islan Sang.[4]  (Id. ¶ 27).  Although Decedent's sister, Rose Sang Brown, was determined to be residing in Brentwood, New York, the locations of the three remaining siblings – Leonard Sang, Laurel Sang, and Islan Sang – were unknown at the time the Complaint was filed.  (Id. ¶¶ 3, 5-7).

In the Complaint, MetLife seeks a determination as to whether the April 30, 2012 designation of Shirley Tillman as beneficiary is valid, in which case the Plan Benefits would be payable to Ms. Tillman.  (Id. ¶ 29).  If the designation is determined to be invalid, then the Plan Benefits would be distributed evenly among the Decedent's living siblings.  (Id. ¶ 30).  MetLife makes no claim to the Plan Benefits except reimbursement of attorney's fees and costs in connection with this action.  (Id. ¶ 31).

Following the filing of the Interpleader Complaint, MetLife made numerous attempts to

---

[4] Although the Complaint identifies this sister as "Hisland Sang," in later submissions, plaintiff identifies her as "Islan Sang a/k/a Islyn Wilkes."  (Pl.'s 11/30/20 Ltr. at 1).  The Court will refer to her as Islan for consistency's sake.

effect service on the Decedent's siblings.  (Pl.'s 11/30/20 Ltr. at 2).  Service was successfully

effected on or waived by Eric Giscombe, Rose Sang Brown, and Shelley Tillman.  (Id. at 2).

Through investigation, MetLife determined that Leonard and Islan Sang both reside in England.

(Id.)  Counsel for MetLife spoke to Leonard Sang's son, who indicated that his father was blind

and that he would attempt to obtain a waiver of service from him.  (Id.)  Leonard Sang's son

further indicated that Islan Sang lived locally but was in ill health and he could not assist in

obtaining a waiver of service from her due to COVID restrictions in England.  (Id.)  Although

MetLife could attempt to hire a process server to serve Leonard and Islan Sang through the

Hague Convention, counsel was not sure that it could be done given the COVID restrictions, and

states that it would be done at "considerable expense," reducing the amount of Plan Benefits

available for distribution to the beneficiary.  (Id.)

On March 11, 2020, Decedent's brother Hughfitz Giscombe passed away.  (See ECF No.

21).  As of November 30, 2020, no administrator or executor had been appointed on behalf of the

Estate and thus, MetLife has been unable to serve the Estate.  (Pl.'s 11/30/20 Ltr. at 2).  Given

the problems and expense associated with service on the remaining siblings, MetLife suggested

that the Court proceed without service on the remaining siblings since Eric Giscombe was the

only sibling challenging the beneficiary designation, and if Eric succeeded in his challenge, all of

his remaining siblings would share equally with him in the distribution of the benefits.  (Id.)

On January 27, 2021, plaintiff filed a motion for an Order to Show Cause, proposing that,

given the difficulties in effecting service on the relatives living in England, the Court proceed to

determine if the benefits would be payable to Ms. Tillman or to the siblings of the Decedent.

(See ECF No. 45).[5]  On February 24, 2021, the Court held a telephone conference to address MetLife's proposed Order to Show Cause why the designation of Shelley Tillman was not valid. (See Electronic Minute Entry, dated Feb. 25, 2021).  At the conference, the Court made inquiry of the participating siblings as to whether they wished to present evidence relating to the beneficiary designation.  (See 3/23/21 Ord.[6]).  Rose Sang Brown, appearing through her daughter Sojorna Jacobs Brown, indicated that she did not wish to participate in a challenge to the beneficiary designation.  (Id. at 2).  Hughfitz Giscombe's wife appeared and indicated that no Estate had yet been created on his behalf.  (Id.)  Neither Leonard nor Islan Sang appeared for the conference despite having been given notice.  (Id.; see also Electronic Minute Entry, dated Feb. 25, 2021).  Ms. Tillman and Eric Giscombe, both appearing pro se, indicated that they wished to proceed.  (3/23/21 Ord. at 2).

On March 5, 2021, the district court referred MetLife's Motion for Order to Show Cause to the undersigned.  (See Electronic Order, dated Mar. 3, 2021).  On March 23, 2021, this Court granted plaintiff's motion for an Order to Show Cause, and, after several attempts to confirm that the parties could appear via video conference, set a conference for September 17, 2021.  (3/23/21 Ord.; see ECF Nos. 50-52).  Accordingly, the Court held a hearing on September 17, 2021 by video conference given the difficulties presented by COVID restrictions, and Mr. Giscombe's inability to travel to New York from his current location in Jamaica.  (See ECF No. 52).

At the hearing, the Court invited Mr. Giscombe to explain the basis for his challenge to

---

[5] If the Court determined that the designated beneficiary under the Plan, Ms. Tillman, was not entitled to receive benefits, then the Plan Benefits would be distributed equally among the remaining siblings, regardless of their participation in this court proceeding.

[6] Citations to "3/23/21 Ord." refer to this Court's March 23, 2021 Order, ECF No. 47.

the designation of Ms. Tillman as beneficiary.  (Tr.[7] at 6).  He explained that he was the one "who used to stay with [his] sister," and that when she was sick, he lived with her for a year and a half.  (Id.)  He further stated that he was the one who buried her when she died, and that the insurance company would not give him any money to bury her.  (Id.)  He further stated that Ms. Tillman never came to the house when he was there with his sister.  (Id.)

Mr. Giscombe claimed that he called the insurance company to change the policy in his name but that his sister was not capable of submitting papers herself because she had dementia. (Id. at 10-11).  He also stated that he did not have any medical records relating to her dementia, except those which were provided by MetLife.  (Id. at 11; see also Claim File[8]).  When asked if he was caring for his sister in April 2012, which is when the paperwork reflects that the designation of beneficiary was changed to Ms. Tillman, Mr. Giscombe answered that he was. (Tr. at 13).  He further indicated that his sister had a bank account and that Ms. Tillman claimed that his sister was gambling and was therefore able to put the money in Ms. Tillman's name.  (Id. at 14).  Mr. Giscombe also explained that he had an older brother who used to live with his sister, but he died of pneumonia before the Decedent passed away.  (Id.)  According to Mr. Giscombe, the brother had a "CD account" in his name and his sister's name that was worth $250,000.  (Id.) He claims that after his brother died, Ms. Tillman took the money out, put it in an account for the

---

[7] Citations to "Tr." refer to the transcript of proceedings held before this Court on September 17, 2021, ECF No. 54.

[8] Citations to "Claim File" refer to the Claim File submitted by plaintiff, filed Jan. 14, 2022, ECF No. 56.  During the hearing, the Court requested that MetLife provide the Claim File since Mr. Giscombe referred to documents contained within it throughout the hearing, including an incident report relating to a claim of fraud by identity theft, dated May 27, 2015, and a letter from Dr. Dwight G. Dukens, indicating that Decedent was his patient and that she had been diagnosed with senile dementia in 2011.  (Claim File at 112-15 (incident report); id. at 116 (doctor letter)).  MetLife previously filed an unredacted version of the Claim File under seal (see ECF No. 55), but since the redacted portions of the File are simply personal identifying information such as birth dates and social security numbers, the Court will refer to the redacted version.

Decedent, and then withdrew all the money without the Decedent knowing about it. (Id. at 14-15). Mr. Giscombe claims that he went to the bank with another brother and the bank told him that Ms. Tillman took the Decedent to the bank and the Decedent put the money in a trust fund in Ms. Tillman's name. (Id. at 15). When pressed, Mr. Giscombe conceded that he had no records to corroborate his statements and the Court notes that Mr. Giscombe did not provide the Court with any evidence of the account generally or any subsequent withdrawals. (Id.)

Shirley Tillman told the Court that she moved in across the street from the Decedent in 1993 and that the Decedent was "my family. She spent every holiday with me, every child's birthday. She was in the hospital when my son was born." (Id. at 16). According to Ms. Tillman, when the Decedent could no longer drive, Ms. Tillman and her husband made sure that the car was paid off so that the Decedent would no longer have to worry about it being on her credit report. (Id.) Ms. Tillman also helped with another credit issue that the Decedent had. (Id.)

According to Ms. Tillman, when the Decedent stopped being able to care for herself, Ms. Tillman made arrangements to let a married man who lived on the street, and whom both individuals knew, stay with the Decedent during the day while Ms. Tillman worked. (Id.) Ms. Tillman stated that Mr. Giscombe was mistaken about being with the Decedent in April 2012, claiming that she was the one who was with the Decedent, paying someone to do the Decedent's hair, and take her food shopping. (Id. at 16-17). She also paid for a home healthcare aide to stay in the house with the Decedent and clean and cook for her. (Id. at 17).

Ms. Tillman claimed that, contrary to Mr. Giscombe's statement, when he arrived in May

of 2018,[9] she was there with her mother and his other cousins from Melbourne and that she told

him everything that she had been doing for his sister.  (Id.)  She claims that Mr. Giscombe's son,

who was raised by the Decedent, told Ms. Tillman that he was not going to move to Florida to

take care of the Decedent so Ms. Tillman "needed to do what [she] needed to do."  (Id. at 18).

According to Ms. Tillman, "I was left here by myself to care for Viva which I had no problems

with because Viva had been there for me with my family."  (Id.)  Ms. Tillman asserted that Mr.

Giscombe was not being truthful because even when he was there when the Decedent was sick, it

was Ms. Tillman who bathed the Decedent and kept her on the weekends "because she did not

want to be there with her brother."  (Id.)  Ms. Tillman conceded that Mr. Giscombe was there for

one year and that she stopped going to Decedent's house because he threatened her and her

mother.  (Id.)  A police report was filed and both parties were Ordered to stay away from each

other.[10]  (Id. at 18).

      According to Ms. Tillman, at one point, she had the Decedent's power of attorney and

elder abuse was called about her when she was selling Decedent's house.  (Id. at 18-19).  She

concedes that she was selling the house but argues she was doing so not to keep the money; she

had set up a room in her own house and was using the money to have someone care for the

Decedent.  (Id. at 19).  She also denied that there was $250,000 that she obtained from the joint

account between Decedent and one of her brothers.  (Id.)  Instead, Ms. Tillman claimed that the

brother's daughter handled the finances and took care of the brother's money.  (Id.)

      She concluded by saying that "I took care of Viva.  I loved her like she was my other

---

[9] The Court notes that it appears that Ms. Tillman misspoke as to the year of Mr. Giscombe's arrival as she later describes events where he was present that occur prior to Decedent's death on July 11, 2016.

[10] The Court notes that it is unclear whether the police report referred to in Ms. Tillman's testimony is the same as that contained in the Claim File.  (See Claim File at 112-13).

mother.  And . . . Viva didn't start getting really incoherent until near the end.  Before that Viva was very clear about everything that was done."  (Id.)  Referring to the power of attorney, she stated that all of the documents were signed by strangers and that neighbors drove the Decedent to Ms. Tillman's job to get her signature on the power of attorney, noting that it was Decedent who "said she wanted me to be her power of attorney."  (Id.)

When asked about the life insurance policy, Ms. Tillman stated that the Decedent called MetLife and had the papers sent to her and then she signed the papers and mailed them back. (Id. at 20).  Ms. Tillman denies that she signed the Decedent's name or forced her to sign; "[t]here is no forgery.  It is her signature.  That's how it came about."  (Id.)  According to Ms. Tillman, the Decedent's family "never came around."  (Id.)  There were family members that the Decedent "helped come to this country and she always helped them, but they never showed up to really be there for her because if they did, there would have been no need or no space for me." (Id. at 19-20).  She claimed that "everything [the Decedent] did she knew what she was doing because [Ms. Tillman] was the one who took care of her, took her everywhere . . . did everything for her.  I made sure she was taken care of."  (Id. at 20).  She further asserted that there were pictures all over the Decedent's house of Ms. Tillman, her husband, her children, and various events.  (Id.)  She further claimed that she helped plan the funeral for the other brother, Harold, before his daughter arrived and that "Eric was not here for any of that."  (Id. at 21).

## DISCUSSION

Plaintiff asks this Court to decide whether Ms. Tillman, as designated beneficiary under the Plan should receive the Decedent's benefits, or whether the designation was improper, and therefore Mr. Giscombe and his surviving siblings should receive the benefits under the Plan. (See ECF No. 45).  Such a request essentially asks this Court to grant summary judgment to

10

either Mr. Giscombe or Ms. Tillman although neither party has filed a motion for summary judgment.  See Krishna v. Colgate Palmolive Co., 7 F.3d 11, 13 (2d Cir. 1993) (discussing, on appeal, district court's *sua sponte* grant of summary judgment as to beneficiary designation); Sun Life Assur. Co. of Canada (U.S.) v. Gruber, No. 05 CV 10194, 2007 WL 4457771, at *12 (S.D.N.Y. Dec. 14, 2007), aff'd sub nom. Sun Life Assur. Co. of Canada v. Gruber, 334 F. App'x 355 (2d Cir. 2009) (discussing summary judgment motions that would determine beneficiary of policy).

In challenging the designation of Ms. Tillman as beneficiary, Mr. Giscombe alleges that "the beneficiary designation was fraudulent" (Tr. at 6), asserting that Ms. Tillman had committed "fraud by identity theft" by forging Decedent's signature to change the beneficiary on Decedent's Plan.  He also argues that Ms. Tillman had otherwise taken advantage of Decedent regarding the beneficiary designation, or that Decedent had "dementia" when he arrived to take care of her such that she could not have changed the beneficiary designation.  (See id. at 12-15).

"It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants." Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010).  Such solicitude "most often consists of liberal construction of pleadings, motion papers, and appellate briefs." Id.  As such, this Court will construe the *pro se* litigants' pleadings and testimony liberally and interpret them to "raise the strongest arguments that they suggest." Pierre v. City of New York, 531 F. Supp. 3d 620, 624 (E.D.N.Y. 2021) (quoting Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)).

At base, Mr. Giscombe's allegations are that Ms. Tillman committed fraud or forgery in changing the beneficiary designation, exercised undue influence over the Decedent to make the Decedent change the beneficiary designation to Ms. Tillman, or that the Decedent's mental

11

health suffered to such a degree that the beneficiary designation was invalid by way of mental incapacity.[11]  Thus, because this Court is essentially being asked to decide a motion for summary judgment, it must determine whether there is any genuine issue of material fact as to whether Ms. Tillman is the proper beneficiary entitled to receive benefits under the Plan and therefore is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990).

A.  Beneficiary Designation Under ERISA

Since the Plan is governed by ERISA, the Court must first establish the proper process for determining a contested beneficiary designation under ERISA.  As noted by the Sixth Circuit, the Supreme Court "has explained that a suit by a beneficiary to recover benefits from an ERISA-covered plan 'falls directly under § 502(a)(1)(B) of ERISA, [29 U.S.C. § 1132(a)(1)(B),] which provides an exclusive federal cause of action for resolution of such disputes.'"  Tinsley v. General Motors Corp., 227 F.3d 700, 704 (6th Cir. 2000) (quoting Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 62–63 (1987)); see also Krishna v. Colgate Palmolive Co., 7 F.3d at 13 (noting that ERISA "supersedes" state law regarding beneficiary designation).  This proposition, otherwise known as preemption, holds true as applied to interpleader actions.  See Hartford Life Ins. Co. v. Einhorn, 497 F. Supp. 2d 398, 401 (E.D.N.Y. 2007) (noting that the interpleader action was governed by ERISA).

---

[11] Throughout his filings with MetLife, Mr. Giscombe refers to a "fraud."  (See Claim File at 110 (describing the beneficiary change as obtained through "fraudulent means"); id. at 112-13 (alleging "fraud" in police report)).  However, it appears that Mr. Giscombe's allegations are that the beneficiary designation was either not done by Decedent—that the form was forged—or Decedent did not know what she was doing when she signed the form—therefore lacking capacity—or was forced to sign the form as a result of undue influence.  (See Tr. at 14-15 (stating that Ms. Tillman put Decedent's accounts in Ms. Tillman's name, including by taking Decedent to the bank to have her transfer the accounts, and noting that Decedent had dementia); Claim File at 110 (arguing that Ms. Tillman "put her name on [the] life insurance . . . by way of a fake power of attorney" and arguing that Ms. Tillman "took advantage of her").

However, while the Plan is governed by ERISA, "the statute contains no specific provisions for the settlement of disputes between claimants."  See Prudential Ins. Co. of Am. v. Schmid, 337 F. Supp. 2d 325, 329 (D. Mass. 2004).  As such, courts look to federal common law regarding beneficiary designations.  See Krishna v. Colgate Palmolive Co., 7 F.3d at 14; Wisconsin Province of Soc'y of Jesus v. Cassem, No. 17 CV 01477, 2020 WL 6198485, at *3 (D. Conn. Oct. 22, 2020) (noting that designations contested on mental incapacity grounds are "clearly controlled by federal common law").  In developing federal common law, "resort may be had to state law in a proper case."  Krishna v. Colgate Palmolive Co., 7 F.3d at 14; see also Tinsley v. General Motors Corp., 227 F.3d at 702 (looking to "state-law principles for guidance" where federal common law undeveloped).  Importantly, any resort to state law must be "consistent with the purposes underlying ERISA."  Krishna v. Colgate Palmolive Co., 7 F.3d at 16 (citations omitted); see Critchlow v. First UNUM Life Ins. Co. of Am., 378 F.3d 246, 256 (2d Cir. 2004).

It appears to this Court that there is no established federal common law in this circuit dealing with forgery, undue influence, or mental incapacity.  However, "[k]eeping in mind that one of the primary purposes of ERISA is to promote the interests of employees and their beneficiaries, courts have customarily used evidence of the insured's intent to establish the proper beneficiary."  American Int'l Life Assur. Co. of New York v. Vazquez, No. 02 CV 141, 2003 WL 548738, at *5 (S.D.N.Y. Feb. 25, 2003).  Courts have also referenced state law when ERISA policies are contested on the basis of forgery, undue influence, and mental incapacity.  See Tinsley v. General Motors Corp., 227 F.3d at 702 (referring to state law where allegations of forgery); Sun Life Assur. Co. of Canada (U.S.) v. Gruber, 2007 WL 4457771, at *12 (looking to New York law on undue influence and lack of capacity challenges); Wisconsin Province of

Soc'y of Jesus v. Cassem, 2020 WL 6198485, at *3 (clarifying that the court looked to state law in denying summary judgment on the basis of lack of capacity but holding that a material dispute as to mental capacity precluded summary judgment, regardless of the standard). Thus, this Court looks to New York state law regarding forgery, undue influence, and mental incapacity to inform its analysis regarding the beneficiary dispute in this case.

## B. Forgery

Mr. Giscombe's first allegation is that Ms. Tillman forged Decedent's signature, thereby committing fraud or identity theft, to change the beneficiary designation. (See Tr. at 12, 15-16). Under New York law, a forgery renders a contract, such as an insurance beneficiary designation, unenforceable. See Beckwith v. Beckwith, 952 N.Y.S.2d 796, 797, 99 A.D.3d 1122, 1123 (2d Dep't 2012). In determining whether a document has been forged, courts have noted that "[i]dentification of handwriting is to be determined by the trier of fact . . .[;] an assertion that a signature was forged cannot ordinarily be resolved on summary judgment." Feehan v. Feehan, No. 09 CV 7016, 2010 WL 3734082, at *9 (S.D.N.Y. July 26, 2010) (citation omitted), report and recommendation adopted, 2010 WL 3734079 (S.D.N.Y. Sept. 22, 2010); see Provident Mut. Life Ins. Co. of Philadelphia v. Ronquillo Mariano, 104 F.3d 350 (2d Cir. 1996) (affirming judgment at trial where allegations of fraud or forgery); United States Life Ins. Co. in City of New York v. Blum, No. 09 CV 9416, 2011 WL 70385, at *4 (S.D.N.Y. Jan. 3, 2011) (denying judgment on the pleadings when allegation of forgery). However, a court may grant summary judgment if the "party contesting the signature's validity [does not] submit sufficient evidence to allow a reasonable juror to conclude that those arguments have merit." Id.

In New York, "[s]omething more than a bald assertion of forgery is required to create an issue of fact contesting the authenticity of a signature." TD Bank, N.A. v. Piccolo Mondo 21st

Century, Inc., 98 A.D.3d 499, 500, 949 N.Y.S.2d 444, 446 (2d Dep't 2012) (holding that defendants raised a "triable issue of fact" where they submitted an affidavit from the signing party stating that she had not signed the allegedly forged document and copies of the signing party's license and passport as examples of her signature). Here, however, the Court only has Mr. Giscombe's testimony that *Decedent*'s signature on the change of beneficiary form is a forgery. The Court is unable to find any case law finding a third-party's assertion of a forgery is sufficient to create an issue of fact. See Banco Popular N. Am. v. Victory Taxi Mgmt., Inc., 1 N.Y.3d 381, 384, 806 N.E.2d 488, 490 (N.Y. 2004) (holding defendant's *own* affidavit that her signature was forged insufficient to create an issue of fact); ECI Fin. Corp. v. Resurrection Temple of Our Lord, Inc., 43 Misc. 3d 1220(A), 999 N.Y.S.2d 796 (N.Y. Sup. Kings Cty. 2014) (same). Aside from his testimony, Mr. Giscombe provides no evidence that would indicate Decedent's signature was forged. Further, Ms. Tillman states that she "never signed or forced [Decedent] to sign" the change in beneficiary and that a third individual was present to witness the signature. (Tr. at 20).

Additionally, while expert testimony is not required to create an issue of fact regarding signature authenticity, see TD Bank, N.A. v. Piccolo Mondo 21st Century, Inc., 949 N.Y.S.2d at 446, 98 A.D.3d at 500, other courts have given significant weight to expert testimony, or the lack thereof. See Ladner v. City of New York, 20 F. Supp. 2d 509, 516 (E.D.N.Y. 1998), aff'd, 181 F.3d 83 (2d Cir. 1999) (granting summary judgment where plaintiffs did "not proffer[] a handwriting expert, but merely express[ed] their own lay opinions that the" signatures were identical and stating that the court reviewed the signatures and could find no similarity); see also Hartford Life Insurance Co. v. Einhorn ex rel. Estate of Mehring, 452 F. Supp. 2d 126, 131-32 (E.D.N.Y. 2006) (granting summary judgment even when defendant challenged affidavit of

handwriting expert because "it [was] sufficient that the signature on the Beneficiary Change was compared to an earlier signature of the decedent, and that the two were found to match").

Although it appears that Mr. Giscombe may not have met his burden of raising more than a "bald assertion of forgery," this Court has considered the Claim File and finds that whether the signature of the Decedent is or is not a forgery raises an issue of fact that makes it inappropriate to grant summary judgment at this time.  Although Decedent's two signatures, the first on the designation of beneficiary from 1969 and the second on the disputed designation of beneficiary from 2012, look fairly similar, this Court finds that the lack of expert testimony and affidavits from other individuals familiar with Decedent's handwriting weighs against allowing for summary judgment at this time.[12]  (See Claim File 104-05); Brass Const. v. Muller, No. 98 CV 5452, 2000 WL 791814, at *2 (S.D.N.Y. June 20, 2000) (finding material issue of fact where there were competing assertions regarding forgery, the proponent alleged that comparison indicated that signature was genuine, and there was no expert report from either party).  The Court also notes that, although courts have granted summary judgment by merely comparing the two signatures, they have done so when it is clear that the signatures are the same.  See Ladner v. City of New York, 20 F. Supp. 2d at 516 (granting summary judgment where court compared signatures and found "no similarity" without presence of expert); United States v. Pent-R-Books, Inc., 538 F.2d 519, 531 (2d Cir. 1976) (affirming summary judgment grant where "apparent" that signatures were "from the same hand").  Here, however, there are differences in the two signatures, including the first letters of Decedent's first and last name, and the Court finds that these differences would benefit from expert testimony or other affidavits.  See Feehan v. Feehan,

---

[12] The Court notes that the "V"s and "G"s in Decedent's signature are distinct, although the more than 40 years between the two could account for that difference.  (See Claim File 104-05).

2010 WL 3734082, at *10 (noting that it should be "obvious" that the signatures are the same in order to grant summary judgment).

Additionally, the Court compared the printed entries on the disputed designation of beneficiary form with the claimant's affidavit submitted by Ms. Tillman to determine if Ms. Tillman prepared the disputed designation of beneficiary form as alleged by Eric Giscombe. Again, while the printed handwriting looks somewhat similar, the issue would be up to the trier of fact to consider and is not an appropriate determination on a motion for summary judgment. (Compare Claim File at 104 with id. at 130). Additionally, the Court is hesitant to recommend granting summary judgment when the only additional evidence that it was *not* a forgery is Ms. Tillman's testimony, although the Court notes that Ms. Tillman's assertion that there was a third-party present at the signing would likely support Ms. Tillman's position at trial if that third-party were to testify at trial. See United States v. Samet, 466 F.3d 251, 256 (2d Cir. 2006) (affirming district court's decision to allow lay testimony as to handwriting).

Accordingly, the Court respectfully recommends that the district judge deny summary judgment on the claim that the designation of Ms. Tillman as beneficiary was a forgery.

C. Undue Influence

Per New York state law, if a party alleges undue influence, it must show "'that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the [victim] to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist.'" Wilton Reassurance Life Co. of New York v. Smith, No. 12 CV 5131, 2015 WL 631973, at *15 (E.D.N.Y. Feb. 13, 2015) (citation omitted). Put another way, it must be "a coercion produced by importunity, or by a silent resistless power which the strong will

often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear." Sun Life Assur. Co. of Canada (U.S.) v. Gruber, 2007 WL 4457771, at *12 (citation omitted). The bar for establishing undue influence is "high." Metropolitan Life Ins. Co. v. Bradway, No. 10 CV 0254, 2011 WL 723579, at *5 (S.D.N.Y. Feb. 24, 2011).

Although the burden of proof is generally on the party contesting the designation, it can shift to the proponent of the designation if "the facts prompt a suspicion that undue influence was indeed exerted, such as where a confidential or fiduciary relationship existed between" the decedent and the designated individual. Sun Life Assur. Co. of Canada (U.S.) v. Gruber, 2007 WL 4457771, at *14. For example, in Matter of Nurse, the court found a confidential relationship existed where the beneficiaries provided "24-hour care" and the decedent, "as a result of his physical and mental ailments, was rendered wholly reliant upon his caregivers." 75 N.Y.S.3d 545, 549, 160 A.D.3d 745, 748 (2d Dep't 2018). Since the beneficiaries "failed to demonstrate that the transaction was fair and free from undue influence" based on their "contradictory and incredible" evidence, the Appellate Division upheld the trial court's undue influence finding. Id.

Such a burden shift rests on a factual determination, which would be made on the basis of evidence, such as testimony or affidavits, introduced at a trial. See Rudolf Nureyev Dance Found. v. Noureeva-Francois, 7 F. Supp. 2d 402, 404 (S.D.N.Y. 1998) (finding no evidence of undue influence after a bench trial); Provident Mut. Life Ins. Co. of Philadelphia v. Vergara, No. 91 CV 5657, 1995 WL 571874, at *4 (S.D.N.Y. Sept. 27, 1995), aff'd sub nom. Provident Mut. Life Ins. Co. of Philadelphia v. Ronquillo Mariano, 104 F.3d 350 (2d Cir. 1996) (same and citing doctor's testimony); see also Tinsley v. Gen. Motors Corp., 227 F.3d at 702 (reversing and

18

remanding for trial on the merits when lower court granted summary judgment in ERISA case finding that allegations of undue influence could not be resolved on summary judgment); Davis v. Adelphia Commc'ns Corp., 475 F. Supp. 2d 600, 601 (W.D. Va. 2007) (holding bench trial where allegations of undue influence in ERISA beneficiary designation case).

Here, beyond the Case File and the conflicting accounts from Ms. Tillman and Mr. Giscombe at the September 17, 2021 hearing, the Court has received no other evidence or testimony from other individuals as to any influence exerted by Ms. Tillman over the Decedent. The parties even contest who was the care-giver for Decedent, making it difficult to determine whether Mr. Giscombe, who is challenging the designation on grounds of undue influence, has presented sufficient evidence to shift the burden to Ms. Tillman to show that she did not exercise undue influence over the Decedent.  (Compare Tr. at 13 with id. at 17).  Accordingly, the Court finds that the evidence before it is insufficient to make a factual determination that would allow the district court to grant summary judgment on the claim of undue influence.

D.  Mental Incapacity

Mr. Giscombe also challenges Ms. Tillman's designation as beneficiary on the grounds that the Decedent lacked the mental capacity to make a meaningful determination as to who the beneficiary should be and to execute the necessary paperwork to finalize that designation.  In New York, the burden of proof and standard to be applied regarding mental competency to change an insurance policy's beneficiary is unsettled, with some courts applying the standard used to determine capacity for making a contract and others applying the testamentary standard. Compare Guardian Life Ins. Co. v. Gilmore, 45 F. Supp. 3d 310, 323-26 (S.D.N.Y. 2014) (noting that some courts have applied the standard for making a will and some have applied that for making a contract but applying the testamentary standard), with New York Life Ins. Co. v.

Brown, No. 19 CV 09437, 2021 WL 325857, at *6 (S.D.N.Y. Feb. 1, 2021) (noting the divergent cases and considering only the "contract standard").

Some courts have applied the contract standard, stating that "[m]ental capacity is determined by a cognitive test: whether the person's mind was 'so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction.'" Sun Life Assur. Co. of Canada (U.S.) v. Gruber, 2007 WL 4457771, at *14 (citation omitted); see also Wilton Reassurance Life Co. of New York v. Smith, 2015 WL 631973, at *15. The contract standard creates a presumption of competence, placing the burden on a "party asserting incapacity." Sun Life Assur. Co of Canada (U.S.) v. Gruber, 2007 WL 4457771, at *14. This standard is "an extremely heavy" burden on the party asserting incapacity. Id. (emphasis in original) (citation omitted). "Illness alone does not give rise to a presumption of incapacity." Id. (citing cases). For example, even where the decedent was hospitalized for Alzheimer's disease, the court found that "the presumption of competency was not overturned" because "none of the medical testimony related to the [decedent's] mental acumen on the day of the transaction." Id. (citing and describing Feiden v. Feiden, 542 N.Y.S.2d 860, 151 A.D.2d 889 (3d Dep't 1989)).

Other courts have applied the testamentary standard, requiring that the decedent understand the nature and consequences of executing the document, know the nature and extent of the property at issue, and know and understand his or her relationship with the individuals who will receive the benefits in question. See, e.g., Guardian Life Ins. Co. v. Gilmore, 45 F. Supp. 3d at 326-27. The "appropriate inquiry is whether the decedent was lucid and rational at the time" the designation was made. Id. at 327. Once the proponent of the beneficiary designation establishes this capacity, the burden shifts to the party disputing capacity. Id. The

burden on the party disputing capacity under the testamentary standard is also heavy; once the burden has shifted, "even medical opinion evidence assumes a relatively minor importance." Id. (quoting In re Estate of Makitra, 956 N.Y.S.2d 780, 782, 101 A.D.3d 1579, 1580 (4th Dep't 2012)).

This Court need not decide which standard is applicable at this point, as both standards require that the party with the burden come forward with information either establishing or refuting capacity. In essence, both standards would require the Court to make a factual determination regarding the capacity of the Decedent at the time she made her beneficiary designation. Either standard would require the parties to provide affidavits or testimony regarding Decedent's capacity at the time she made the beneficiary designation. See New York Life Ins. Co. v. Brown, 2021 WL 325857, at *6 (considering affidavits and "undisputed testimony" in contract standard case); Guardian Life Ins. Co. v. Gilmore, 45 F. Supp. 3d at 328 (describing three affidavits submitted in support of testamentary capacity); In re Estate of Makitra, 101 A.D.3d at 1581, 956 N.Y.S.2d at 782 (noting that there was trial testimony and a videotape of the decedent as he signed the document that satisfied the testamentary capacity standard); Feiden v. Feiden, 542 N.Y.S.2d at 862-63, 151 A.D.2d at 891 (discussing medical testimony from trial court in contract standard case).

Again, this Court has heard only the testimony of Ms. Tillman and Mr. Giscombe; neither has presented affidavits or testimony from anyone else as to the Decedent's state of mind and mental capacity at the time she made the beneficiary designation in April of 2012. Furthermore, although plaintiff's Claim File contains a doctor's note indicating that Decedent received a diagnosis of dementia in 2011, there are no details contained in the letter to indicate to what extent this impacted the Decedent's mental acumen and ability to carry on her own affairs. (See

Claim File at 116). Indeed, an Alzheimer's diagnosis on April 22, 2015 says nothing about the Decedent's capacity on the day she signed the beneficiary designation three years earlier. (See Tr. at 12); Sun Life Assurance Co. of Canada (U.S.) v. Gruber, 2007 WL 4457771, at *14 (citing Feiden v. Feiden, 542 N.Y.S.2d at 863, 151 A.D.2d at 891).

Ms. Tillman testified that it was the Decedent who contacted MetLife to change the beneficiary designation and that the Decedent only started to become incoherent near the end of her life. (Tr. at 19-20). Further, she testified that Decedent was "very clear about everything that was done," was the one who had the papers sent to her home from MetLife, and "had one of her neighbors drive" Decedent to Ms. Tillman's work to have her sign the forms. (Id.) Under at least the contract standard, since Mr. Giscombe is raising the issue of capacity, he would have the burden of showing that the Decedent was so affected by dementia in April 2012 that she could not have been mentally competent to effect the change of beneficiary. Although he claims that he was with the Decedent in April 2012 – a claim disputed by Ms. Tillman[13] – he did not provide any testimony regarding the Decedent's mental state at that time. Indeed, if, as he claims, he was with the Decedent at the time the beneficiary designation was changed, it is unclear why he was unaware of this change then and waited to challenge it until after her death.[14]

---

[13] The Court also notes that the police incident report, filed on May 27, 2015, states that Mr. Giscombe "just recently showed up from Jamaica." (Claim File at 113).

[14] Mr. Giscombe testified that he attempted to change the beneficiary designation to be under his name. (See Tr. 10-11). However, the Court notes that there is no record in the Claim File stating that he contacted MetLife on behalf of Decedent prior to her death, other than a letter from Mr. Giscombe, dated July 15, 2016, sating that he "thought [he] took her name off a year ago when [he] was instated as [Decedent's] power of attorney." (Claim File at 108). The earliest correspondence regarding the designation was an internal email from July 13, 2016 stating that Mr. Giscombe was planning on contesting Ms. Tillman's status as beneficiary. (See id. at 119; see also id. at 95 (providing internal MetLife notes)). This email was sent two days after Decedent's death. (Id. at 120).

Lastly, Mr. Giscombe states that Decedent executed a power of attorney in his favor in 2015. Given his testimony that the Decedent was suffering from dementia in 2012 when the change of beneficiary form was signed, it is unclear how the Decedent could then be sufficiently competent three years later to execute the power of attorney. (See Claim File at 110, 113). In summary, the evidence presented to the Court is in dispute and the Court is unable to make a determination regarding the proper beneficiary at this time.

E. A Bench Trial or Court-Ordered Mediation is Appropriate

Since the competing claims necessitate resolution of factual issues, a trial is warranted. Although ERISA claims can be resolved on motions for summary judgment, see, e.g. Sun Life Assur. Co. of Canada (U.S.) v. Gruber, 2007 WL 4457771, courts have found that summary judgment is inappropriate where issues of intent to change beneficiary designations are in dispute. See Krishna v. Colgate Palmolive Co., 7 F.3d at 16 (noting that summary judgment is "notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles"); Hartford Life Ins. Co. v. Einhorn, 497 F. Supp. 2d 402 (holding summary judgment inappropriate when determining whether decedent intended to affect a beneficiary change). This Court therefore respectfully recommends that the district judge set a trial date at which the issues of the Decedent's mental capacity and intent to change the beneficiary can be determined. See Metro. Life Ins. Co. v. Jacques, No. 06 CV 444A, 2009 WL 1322305, at *1 (W.D.N.Y. May 12, 2009) (setting trial date in ERISA case where "[b]oth parties ask that the Court draw certain inferences in their favor based on the existing facts"); Metro. Life Ins. Co. v. Barr, No. 02 CV 6905, 2003 WL 359469, at *3 (S.D.N.Y. Feb. 6, 2003) (setting trial date in ERISA case where dispute over benefits). The trial would also establish whether Decedent signed both beneficiary forms, as allegations of forgery are "determined by

the trier of fact." Feehan v. Feehan, 2010 WL 3734082, at *9.

The Court cautions, however, that a trial would be very expensive, requiring Ms. Tillman to travel to New York and Mr. Giscombe to travel from Jamaica, not to mention the associated costs of arranging for other witnesses who could provide evidence as to the Decedent's mental state and her relationship with the various parties, additional medical evidence regarding her capacity at the time of the change in designation, and handwriting expert testimony. Given the limited funds involved in this case, and the fact that Mr. Giscombe, if he were to succeed in his challenge, would be required to split the proceeds with his four siblings who were alive at the time of the Decedent's death, the most he could expect to recover would be $5,600, not taking into account any amounts that would be deducted for the fees and costs incurred by MetLife in bringing this action. Thus, any amount he might receive in continued litigation would barely cover the costs of bringing the case to trial in New York. The Court also cautions that given the backlog of trial-ready cases due to the COVID-19 pandemic, this trial might not be scheduled for months, which may be an additional consideration given the age of Decedent's siblings.

Accordingly, as an alternative to trial, the Court respectfully recommends that the district judge refer this case for court-ordered mediation. In Wilton Reassurance Life Co. of New York v. Smith, the court referred the case for mediation, noting that "the pro se Defendants have each raised concerns about the time, money and effort they have expended in this case." 2015 WL 631973, at *18. This Court finds the reasoning in Wilton Reassurance Life Co. extremely persuasive in this case, particularly because the parties are located around the world, and such mediation could occur "by telephone or videoconference connection," which would eliminate the costs associated with a full trial.

## CONCLUSION

Accordingly, it is respectfully recommended that the District Judge set a trial date or Order the parties to engage in court-Ordered mediation.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail. The Clerk of Court is further respectfully directed to send a copy of this Order to the following address via FedEx International.

Eric Giscombe
876-867-7877
Tranquility District, Buff Bay Post Office
Portland, Jamaica
West Indies

**SO ORDERED.**

Dated:  January 21, 2022
        Brooklyn, New York

_Cheryl L. Pollak_
CHERYL L. POLLAK
Chief United States Magistrate Judge
Eastern District of New York